| | |
|---|---|
| UNITED STATES OF AMERICA | |
| Plaintiff, | |
| vs. | Case No. 3:16-CR-00046 |
| Szuhsiung Ho a/k/a Allen Ho, | |
| Defendant. | |

**DEFENDANT ALLEN HO'S REPLY IN SUPPORT OF HIS
MOTION TO SUPPRESS STATEMENTS**

Rather than "scrupulously honor" Defendant Allen Ho's unambiguous and repeated requests for counsel as mandated by law, *see Michigan v. Mosley*, 423 U.S. 96, 103 (1975), government agents engaged in an elaborate subterfuge in an ultimately successful attempt to entice and cajole Dr. Ho into making post-arrest, post-*Miranda* statements. The cases cited by the government in its Opposition offer no support because the police conduct in Dr. Ho's case bears no resemblance to the factual scenarios where other courts found no Fifth Amendment violations.

I.      **ARGUMENT**

A.      **The government violated Dr. Ho's Fifth Amendment rights**.

The government concedes in its Opposition that after Dr. Ho was advised of his *Miranda* rights, he requested to speak to a lawyer before answering any questions. *See* ECF No. 51 at 3. Of course, that should have ended all conversation then and there. The law is unambiguous:

> Once warnings have been given, the subsequent procedure is clear. If the individual indicates ***in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease***. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any

statement taken after the person invokes his privilege cannot be other than the product of compulsion, *subtle or otherwise*.

*Miranda v. Arizona*, 384 U.S. 436, 473–74 (1966) (emphases added).

The government agents violated Dr. Ho's Fifth Amendment rights when, rather than respect Dr. Ho's request for counsel by ceasing all conversation, they ignored his request for counsel and, instead, "offered to explain to Defendant Ho the evidence and investigation that led to Defendant Ho being indicted." ECF No. 51 at 3. This "offer," ostensibly done for Dr. Ho's benefit, was clearly just the opposite—it was a ploy to get Dr. Ho into a small, confined interrogation room with two agents and binders full of evidence, and to begin a conversation that would, predictably and wholly by design, lead to statements that the government now seeks to introduce against him.

Once in the interview room, the two agents—one doing the talking, the second with a notebook open and a pen in hand, obviously ready to record the anticipated utterances of Dr. Ho—manipulated and enticed Dr. Ho into engaging with them. The unmistakable goal was not to educate Dr. Ho about the evidence against him but, rather, to obtain statements that it could use against him at trial. Agent Leckrone began by telling Dr. Ho that, "I'm sure you have lots of questions. Maybe you don't. I don't know. But we wanted to give you an opportunity to ask them." Tr. of Apr. 14, 2016 Recording of FBI Interview of Dr. Ho ("Tr.") at 1.[1] In the ensuing 50 plus minutes, the following exchanges occurred:

Agent Leckrone: I mean, you understand how big CGNPC is.

Dr. Ho: No.

---

[1] For the convenience of the Court, counsel for Dr. Ho has prepared an unofficial transcript of the April 14, 2016 FBI interview of Dr. Ho and attached it as Exhibit 1. The recording of this interview is stored on a disc that was manually filed with this Court. *See* ECF No. 39.

Agent Leckrone: You don't?

Dr. Ho: No. Most of the companies in China, they are state-owned. If – all I know is that it's one of the three [ ] companies in China. But if you ask me would I know how big it is, then I don't.

Tr. at 4.

* * * *

Agent Leckrone: And I don't know, that's one of these – there might be some misconceptions here. And these are things that I want to talk to you about before I go talk to Jian Lai, because I don't want to accuse him of something he's not. I just want to give you the information. Ron Knott, Ron Kesterson, [] Kenworthy. [] Kenworthy – Mr. Rudy was helping you recruit him from [].

Dr. Ho: Oh, okay. But nothing happened.

Agent Leckrone: Nothing happened. You're right. John Land. I can't say Roman's last name . . .

Dr. Ho: I cannot pronounce his name.

Agent Leckrone: Right? He's got a tough one, but he helped you with the reactor [ ] project. Daria Bellacassa. Daria worked with you on some of the MHI projects. And then he pushed back because he wasn't very comfortable with the CGM project is the way that I read it.

Dr. Ho: Okay, yeah.

*Id.* at 5.

* * * *

Agent Leckrone: I talked at EPRI. The EPRI CEO knows the CGNPC CEO personally. . . . And an EPRI membership costs, what, do you know?

Dr. Ho: It's expensive.

Agent Leckrone: I think TVA pays somewhere around $40 million for a three year membership.

Dr. Ho: $40 million.

Agent Leckrone: Yeah. It's a big deal. So we talked to EPRI. They're not happy. I don't think they will be when we're able to show this. And then we'll talk to Areva and it's very clear that you've been tasked to fill in the black boxes,

3

to fill in the missing pieces of the tech transfer that Areva did not want to sell to CGNPC.

Dr. Ho:  Oh?  I never heard about it.

Agent Leckrone:  Your own emails call the thing black boxes, and this is kind of where Tim warned you earlier.

Dr. Ho:  I'd like to read that one then.

Agent Leckrone:  Okay.  We can definitely get in to all that.  But the fact is that – and maybe I'm wrong, and – it's very possible.  And I will never know until you tell me.

*Id.* at 6.

\* \* \* \*

Agent Leckrone: . . . . I'm not making anything up. The people that I talked to in the industry have never been paid for accommodating a visitor. So it strikes me as odd. But nonetheless, ETI managed to pay Mr. Guey for that visit.

Dr. Ho:  I have a very good reason for that, but I'll wait until my lawyer's here I'll explain all those things.

Agent Leckrone:  Okay. Then we have countless contractors, individual contractors and companies, that have talked to you over the years about 810, raised concerns. You know them, I know them.  Half of them are on that list of people that we're going to go talk to.

Dr. Ho:  Most conversations took place between me and George Rudy right?  I think you've mentioned that person's name?  Yeah, I think he was the guy doing all those – talking.

Agent Leckrone:  And it looks like he's clearly trying to help you go through the 810 process.

Dr. Ho:  I told him that. I told him that day for this – to go through this 810 process.

Agent Leckrone:  Right. And that's what I'm saying, is that you understand 810. You know it exists.

Dr. Ho:  Yeah.

*Id.* at 7–8.

\* \* \* \*

4

Agent Leckrone:  And I'd be holding back information if I didn't tell you.  Okay? . . . we might start seizing assets that were bought with the funds provided by ETI, which could include your house, your cars, your retirement accounts in Morgan Stanley.  We could – there could be implications for other people to be arrested, to include several of these consultants, because they have 810 violations.  Annie, because she is the treasurer of ETI, and her knowledge of what was going on appears, in the emails, to be fairly substantial.  And potentially Jian Lai, because now he's listed as a general manager.  And I don't know what he knows, but these are things that we might have to presume.  And then we have your tax issue.  Are you aware of the fact that you haven't paid taxes?  The IRS says you haven't paid taxes in over five years.

Dr. Ho:  I did pay taxes every year.

Agent Leckrone:  We looked for your social security number and we didn't find anything under your name or Annie's name.

Dr. Ho:  Oh, because that's the – what do you call it – the S corporations?  So these two things combined.

Agent Leckrone:  Okay.  That's good.  That's one less thing we gotta worry about.  That's fantastic.

Dr. Ho:  Yeah.

Agent Leckrone:  But I want you to realize there is a lot going on.  The process today is fine.  You don't have to talk.  I just want you to know, kind of, that this wasn't whimsical.  This isn't something we just did.  There's a lot of work that's gone in to this.

Dr. Ho:  Yeah. I think – and I want things to explain, but I think if I have a lawyer here, I would be more comfortable.

Agent Leckrone:  And that is – that's great. And we will wait. That is not a problem.  But I wanted to make sure you knew where I was coming from.  Okay? . . . It's kind of my job to encourage you to cooperate, because there are things out there. I honestly don't want to harass a lot of these guys. I mean, Mr. Wu is how old? He's eighty something. Mr. Toshiyo is the same. I don't want to bother them. But if I don't know, I have to go ask. And down the road, if it works out that you're found guilty, there will be what is called a downward departure process. And that is basically where – it's an opportunity for you to help yourself. Okay? And traditionally, the judge looks at two things. So I told you there's a gap, right? Thirty years to life. The judge looks at that and he makes a decision. And his decision, he generally will ask the case agents for a recommendation. . . . We looked at your accounts, millions of dollars over a five, six year period have come over from your company in First Link in Hong Kong. It's hard to walk away.

Dr. Ho:  Millions of dollars, hundreds of thousands. You – maybe you're seeing

one extra zero.

Agent Leckrone:  It's hard to walk away from success.

Dr. Ho:  Yeah, I know, but if we can make the impression corrected, it's only hundreds of thousands of dollars.

Agent Leckrone: We've done financial analysis. I can show you here, since you brought it up. So we were having a look, and this is from 2009 to 2014. And it looks like money gets transferred from the Bank of China to First Link, and from First Link in to ETI accounts. In the one account, we've got $2.2 million, give or take.

Dr. Ho:  Oh, you meant overall.

Agent Leckrone:  Yes, sir.

Dr. Ho:  Oh, okay.

Agent Leckrone:  And then $750,000 in the other. So that's five years, roughly $3 million, where we can show the money kind of over time.

Dr. Ho:  Yeah, that's about right.

Agent Leckrone:  It's hard to walk away from success, and – that's my theory, is that –

Dr. Ho:  It's not the profit. It's [] costs.

Agent Leckrone:  No, sir. I know you gotta pay for your business. You gotta pay your consultants. You gotta pay their airfare. I absolutely agree. . . . And maybe I'm completely confused. But in our idea of how China works, is that at the end of the day, whatever's good for commercial is also good for military. And whatever's good –

Dr. Ho:  This is something I don't know.

Agent Leckrone:  Okay.  Just hear me out.

Dr. Ho:  Okay.

Agent Leckrone:  So whatever's good for military's good for commercial, too. You know? At the end of the day, they're both hands and they're both feeding the body and they want to work together. And –

Dr. Ho:  I agree with you that one thing is clear to me. Some of the organizations in China, they don't divide the function between military and commercial, which is true.

6

Agent Leckrone: Right.

Dr. Ho: Yeah.

Agent Leckrone: So – and you have a relationship at NPIC now, right? With the lab? That might be one of those places.

Dr. Ho: Yeah. That's one of the places.

Agent Leckrone: Okay.

Dr. Ho: But not CGNPC. CGNPC is purely civil.

*Id.* at 9–12.

\* \* \* \*

Agent Leckrone: Absolutely, so – that's going to deal – that's going to come in to the part with your lawyer. You're going to have a lawyer, and he's going to look at it, and he's going to lawyer. Because that's what lawyers do. And he'll get you a deal. And in that deal, you'll have to take some responsibility. It's just kind of how it works.

Dr. Ho: So did I hear you correctly? Your accountability is equivalent to responsibility here?

Agent Leckrone: Yes.

Dr. Ho: Okay.

Agent Leckrone: It's that you knew that 810 existed. You knew that it was applicable to the technology–

Dr. Ho: I didn't know 810 until three years ago, when someone said "Oh, there's a conference held in Washington, DC area about 810." And–

*Id.* at 13–14; *see also id.* at 3.

It bears emphasizing that this entire exchange occurred *after* Dr. Ho invoked his right to

counsel—a right that must be "scrupulously honored." *Mosley*, 423 U.S. at 103. Moreover, Dr.

Ho invoked his Fifth Amendment right to counsel *two additional times during the interview*.

Both of these requests were ignored by the agents and the interrogation continued unabated. *See*

Tr. at 7 ("I'll wait until my lawyer's here to explain all those things."), 9 ("I think if I have a

7

lawyer here, I would be more comfortable."). The government's description of this interrogation as simply Agent Leckrone "explain[ing] several key facts discovered during the investigation into Defendant Ho's activities," (ECF No. 51 at 4), is jarring. This was a protracted effort to coerce Dr. Ho into providing incriminating statements despite the fact that he had invoked his right to counsel three times. The government's trampling of Dr. Ho's Fifth Amendment rights cannot be tolerated.

> **B.      The government's cited cases are completely inapposite.**

The cases cited by the government are so factually dissimilar to what occurred here, they are of no help to the government. In *United States v. Collins*, 683 F.3d 697 (6th Cir. 2012), the officer located a gun under the front seat of the car during a traffic stop. *Id.* at 700. Pre-arrest, the officer asked the driver and passenger who owned the gun. *Id.* When both initially denied knowing about the gun, the officer indicated they both would then be arrested and, in response, Collins said the gun was his. *Id.* In contrast to Dr. Ho's case, (1) *Collins* occurred pre-arrest, (2) no *Miranda* warnings were given, (3) the defendant did not request counsel, and (4) the officer did not place the defendant in an interview room and then attempt to persuade him to talk. The case is inapposite.

*United States v. Conley*, 156 F.3d 78 (1st Cir. 1998) is similarly unhelpful. Conley was arrested at his home for drug trafficking and, after being read his *Miranda* warnings, requested counsel. *Id*. at 81. While the agents waited for a search warrant for the house, Conley "beseech[ed] [the agent] to tell him 'what is going on' and 'what have you guys got on me, what's this all about?'" *Id.* The agents reminded Conley that he had requested counsel and, therefore, they could not speak with him. *Id*. Conley "nonetheless persisted" and the agent "stated that if he [the agent] were to speak further, [Conley] could not reply. Conley readily agreed to this condition." *Id.* After the agent described the facts of the investigation, Conley

8

"blurted" out an incriminating response. *Id*. These facts bear no resemblance to what occurred

here. Conley "beseeched" the agents to tell him what their case against him was all about and,

despite being admonished that the agents could not speak with him because he had invoked his

right to counsel—and after promising not to respond to their description of the facts —the

defendant "blurted" out a response. In contrast, Dr. Ho (1) invoked his right to counsel three

times, (2) was interrogated in a small room, (3) ***did not*** request to have the case details described

to him—this was an offer initiated by Agent Leckrone, and (4) was questioned directly. *See* ECF

No. 51 at 3. And, as the video of Dr. Ho's interrogation makes clear, he did not blurt out

anything—Agent Leckrone pried information out of him by dangling facts, suggesting answers,

and implicitly threatening him and his wife with additional charges if he did not cooperate.

*United States v. Payne*, 954 F.2d 199 (4th Cir. 1992) is similarly unhelpful. There, after

arresting Payne, the agents driving him to an FBI office were told that a gun was found at

Payne's house. *Id.* at 201. The agent told Payne: "'They found a gun at your house.' Payne

responded, 'I just had it for my protection.'" *Id*. No other conversation occurred. Again, this

fact pattern bears no resemblance to the instant case. The Fourth Circuit unsurprising holding

that "mere declaratory descriptions of incriminating evidence do not invariably constitute

interrogation for *Miranda* purposes," is irrelevant to the instant case. *Id.* at 203. The

government's characterization of Agent Leckrone's lengthy questioning as a "mere declaratory

description of incriminating evidence" is risible. Agent Leckrone's "offer" to explain the

evidence against Dr. Ho was a mere ruse to get Dr. Ho into the interview room with him to start

talking. Once there, Agent Leckrone spoke at length about how serious and well-investigated the

case against Dr. Ho supposedly was, telling him:

It's a big statement for the US government to charge a Chinese state-owned company, and they don't take that very lightly. And in order to do that, they had to see a lot of evidence, and they had to agree that the evidence obviously said that that was the direction we were headed. So what I'm trying to say is that – I want you to understand that this wasn't done on a whim.

Tr. at 4. Agent Leckrone not only discussed the evidence against Dr. Ho, he told Dr. Ho his personal theories of why Dr. Ho engaged in the conduct alleged in the Indictment.[2] And beyond just describing the government's evidence against Dr. Ho, Agent Leckrone (1) identified the sentence Dr. Ho was likely to face,[3] (2) named more than a dozen individuals and entities that the government was preparing to interview,[4] (3) suggested that those interviews could be obviated if Dr. Ho cooperated, and (4) threatened to arrest Dr. Ho's wife and seize his home.[5] Agent Leckrone also questioned Dr. Ho about his alleged failure to pay taxes,[6] an allegation for which Dr. Ho was not even indicted. *See* ECF No. 3. Simply put, the gulf between the facts of the cases cited by the government and the facts here is vast, wide, and deep.

---

[2] "I imagine there's a story in there. To be honest with you, I have that you were – and this is my own theory, and you can tell me if I'm crazy . . . ." *Id*. at 10.

[3] "You're looking at thirty years to life in prison, and a $250,000 fine. That is a substantial penalty, and I know that's overwhelming." *Id*. at 8.

[4] "[W]e plan on talking to the majority of these people on this list. Alan Wu, Charles Beard, Carlos Fughetti, Wen Yi Ouyang, if he gets back. . . . David Seel, Kevin Hoskins, Carl Olson, your old friend from TVA Weng Lao. . . . Mr. George Rudy, Toshiyo Morita, your accountant, Pei Pei Xiang. Robert Comstock. Your two CANTA buddies." *Id*. at 4–5.

[5] "[W]e might start seizing . . . your house, your cars, your retirement accounts in Morgan Stanley. We could – there could be implications for other people to be arrested, to include several of these consultants, because they have 810 violations. Annie [Dr. Ho's wife], because she is the treasurer of ETI, and her knowledge of what was going on appears, in the emails, to be fairly substantial." *Id*. at 9.

[6] "And then we have your tax issue. Are you aware of the fact that you haven't paid taxes? The IRS says you haven't paid taxes in over five years." *Id*.

10

## II.    CONCLUSION

Rather than respect Dr. Ho's request for counsel, government agents consciously and deliberately contrived to pressure Dr. Ho to speak with them.  The entire exchange that occurred after Dr. Ho asserted his right for counsel was a violation of Dr. Ho's Fifth Amendment rights, and should, therefore, be suppressed.

Dated:  September 12, 2016                          Respectfully submitted,

/s/ Peter Zeidenberg
Peter Zeidenberg (*pro hac vice*)
Taniel Anderson  (*pro hac vice*)
ARENT FOX LLP
1717 K Street, NW
Washington, DC 20006
Tel: (202) 857-6000
Fax: (202) 857-6395
Email:  Peter.Zeidenberg@arentfox.com
           Taniel.Anderson@arentfox.com


Wade V. Davies [BPR # 016052]
Ritchie, Dillard, Davies & Johnson, P.C.
606 West Main Street
Suite 300
Knoxville, TN 37902
Tel:  865-637-0661
Fax: 865-524-4623
Email: wdavies@rddjlaw.com

*Attorneys for Defendant Allen Ho*

11

## CERTIFICATE OF SERVICE

I hereby certify that on September 12, 2016, I caused true and correct copies of the

foregoing document and Exhibit 1 to be filed with the Clerk of the Court using the CM/ECF

system, which will send a notice of electronic filing to the attorneys of record in this matter.


/s/ Peter Zeidenberg
Peter Zeidenberg